980 F.Supp. 962 (1997)
A WOMAN'S CHOICE-EAST SIDE WOMEN'S CLINIC; Indianapolis Women's Facility; A Clinic for Women, Inc.; Planned Parenthood of Central and Southern Indiana, Inc.; Fort Wayne Women's Health Organization, Inc.; Ulrich G. Klopfer, D.O.; Women's Pavilion, Inc.; and Friendship Family Planning Clinic of Indiana, on behalf of themselves and their patients seeking abortions, Plaintiffs,
v.
Scott C. NEWMAN, in his official capacity as Prosecuting Attorney for Marion County, and as representative of the class of all prosecuting attorneys in the State of Indiana; and John C. Bailey, M.D., in his official capacity as Commissioner of the Indiana Department of Health, Defendants.
No. IP 95-1148-C H/G.
United States District Court, S.D. Indiana, Indianapolis Division.
October 14, 1997.
*963 Mary J. Hoeller, Dutton & Overman, Indianapolis, IN, Simon Heller, Center of Reproductive Law & Policy, New York City, for plaintiffs A Woman's Choice-East Side Women's Clinic, Indianapolis Women's Facility, A Clinic for Women, Inc., Fort Wayne Women's Health Organization, Ulrich G. Klopfer, D.O. Women's Pavilion, Inc. and Friendship Family Planning Clinic of Indiana.
*964 Colleen Connell, American Civil Liberties Union, Chicago, IL, Kenneth J. Falk, Indiana Civil Liberties Union, for plaintiff Planned Parenthood of Central and Southern Indiana.
Jon Laramore, Office of the Atty. General, Indianapolis, IN, for defendants Scott C. Newman, John C. Bailey, M.D.

ENTRY ON MOTION TO MODIFY OR VACATE PRELIMINARY INJUNCTION
HAMILTON, District Judge.
On November 9, 1995, this court issued a preliminary injunction enjoining enforcement of Indiana's Public Law 187 enacted in 1995. See A Woman's Choice  East Side Women's Clinic v. Newman, 904 F.Supp. 1434 (S.D.Ind.1995). Public Law 187 requires that at least 18 hours before a woman may have an abortion to terminate a pregnancy, she must be given certain medical information and information concerning alternatives to abortion. See Ind.Code § 16-34-2-1.1.
In issuing the preliminary injunction, the court concluded that plaintiffs were likely to succeed on two separate challenges to the law. First, the "medical emergency" exception to the 18-hour waiting period and information requirements in Public Law 187 appeared to be much too narrow to pass constitutional muster. That conclusion led to an injunction against the entire act. Second, under the controlling "undue burden" standard set forth in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 877-78, 112 S.Ct. 2791, 2820-21, 120 L.Ed.2d 674 (1992), the law's requirement that the State-mandated information be provided "in the presence" of the woman seeking an abortion appeared to impose an unconstitutional burden on a woman's right to choose to have an abortion. As a practical matter, that provision requires the vast majority of women seeking an abortion to make two trips to an abortion clinic. For many women that requirement would make abortion more expensive and less convenient, but it would not actually prevent them from obtaining an abortion. But for a significant fraction of women affected by the law  especially those in abusive or potentially abusive relationships  the requirement is likely to prevent them from obtaining abortions they would otherwise choose to have. See A Woman's Choice v. Newman, 904 F.Supp. at 1453-62.
At the time the court issued the preliminary injunction, it also certified questions to the Supreme Court of Indiana concerning the interpretation  as a matter of State law  of the medical emergency exception to the law's requirements. The Supreme Court of Indiana has answered this court's certified questions. A majority of that court disagreed with this court's predictions about the scope of the medical emergency exception in the law. See A Woman's Choice  East Side Women's Clinic v. Newman, 671 N.E.2d 104 (Ind.1996). After the Supreme Court of Indiana denied rehearing in the case, defendants moved to vacate or modify the court's preliminary injunction. The parties have submitted briefs, affidavits, deposition testimony, and oral argument. Neither side sought an evidentiary hearing on the motion.
Upon consideration of the parties' submissions, the court concludes: (1) the Supreme Court of Indiana's construction of the medical emergency exception is sufficient to persuade the court that the law's enforcement should not be entirely enjoined, and (2) the grounds for the preliminary injunction against enforcement of the "in the presence" requirement in Public Law 187 remain valid. Accordingly, the court will modify its injunction to permit enforcement of the waiting period and mandatory disclosure provisions of Public Law 187. These provisions of the law appear likely to be useless, patronizing, and annoying, and there is no evidence that these provisions will actually serve any constitutionally legitimate purpose. Nevertheless, this court is bound to apply the controlling "undue burden" standard set forth in the plurality opinion in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. at 877-78, 112 S.Ct. at 2820-21. On the existing record, plaintiffs are not likely to succeed in showing that the mandatory disclosure and waiting period requirements will impose burdens that will actually prevent a substantial number of women from having abortions they would otherwise choose to *965 have.[1] However, plaintiffs are still likely to succeed on their challenge to the "in the presence" requirement The court will continue the injunction against enforcement of that requirement, so that the State-mandated information may be provided by telephone. The modification will take effect one month from today.

I. The "Medical Emergency" Exception

In regulating abortions, States must ensure that their regulations do not cause significant harm to the health of the pregnant woman. See Roe v. Wade, 410 U.S. 113, 164-65, 93 S.Ct. 705, 732-33, 35 L.Ed.2d 147 (1973) (even after fetus becomes viable, State may not regulate or prohibit abortions necessary to preserve life or health of the mother); Doe v. Bolton, 410 U.S. 179, 192, 93 S.Ct. 739, 747-48, 35 L.Ed.2d 201 (1973) (medical judgment about need for abortion may be exercised in light of all factors relevant to patient's well-being, including "physical, emotional, psychological, and familial [factors], and the woman's age"); Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. at 880, 112 S.Ct. at 2821-22 (if statute foreclosed possibility of immediate abortion despite "significant health risks," Supreme Court "would be required to invalidate the restrictive operation of the provision"). Public Law 187 contains an exception to the disclosure and waiting period requirements when a woman faces a "medical emergency." As defined in Public Law 187, a "medical emergency"
means a condition that, on the basis of the attending physician's good faith clinical judgment, complicates the medical condition of a pregnant woman so that it necessitates the immediate termination of her pregnancy to avert her death or for which a delay would create serious risk of substantial and irreversible impairment of a major bodily function.
Ind.Code § 16-18-2-223.5. A physician who believes there is a medical emergency must provide information concerning that medical judgment to the woman:
When a medical emergency compels the performance of an abortion, the physician who will perform the abortion shall inform the woman, before the abortion if possible, of the medical indications supporting the physician's judgment that an abortion is necessary to avert:
(1) the woman's death; or
(2) a substantial and irreversible impairment of a major bodily function.
Ind.Code § 16-34-2-1.2.
In deciding plaintiffs' motion for a preliminary injunction, this court had to predict how the Supreme Court of Indiana would interpret the medical emergency exception as a matter of State law. At the same time, because there were reasonable grounds for disagreement on controlling issues of State law, the court granted defendants' motion to certify issues of State law to the Supreme Court of Indiana pursuant to Rule 15(O) of the Indiana Rules of Appellate Procedure. This court certified three questions to the Supreme Court of Indiana:
(1) Does the definition except a woman from compliance with Ind.Code § 16-34-2-1.1 when such compliance would in any way pose a significant threat to the life or health of the woman?
(2) Does the definition except a woman from compliance with Ind.Code § 16-34-2-1.1 when such compliance threatens to cause severe but temporary physical health problems for the woman?
(3) Does the definition except a woman from compliance with Ind.Code § 16-34-2-1.1 when such compliance threatens to cause severe psychological harm to the woman?
As things turned out, there were indeed reasonable grounds for disagreement. The Supreme Court of Indiana answered yes to the first and third questions by votes of 3-2, and no to the second question by a unanimous vote. 671 N.E.2d at 106.
*966 In view of the narrow language used in the medical emergency provision, the committee amendment, the House floor amendment restoring the original language, and the House sponsor's insistence that the restrictive language was needed to prevent the exception from being applied to the broad concept of "health" used in Doe v. Bolton, it is difficult to see any additional steps the State legislature could have taken to show that it indeed meant to enact a medical emergency exception as narrow as the statutory language suggests. See generally 904 F.Supp. at 1468-72. Nevertheless, this debate over State law is now over. The States are free to allocate the lawmaking function to whatever branch of State government they may choose; the federal Constitution does not restrict their choices. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981); id. at 479-81 & nn. 3-5, 101 S.Ct. at 732-33 nn. 3-5 (Stevens, J., dissenting); Uphaus v. Wyman, 360 U.S. 72, 77, 79 S.Ct. 1040, 1044-45, 3 L.Ed.2d 1090 (1959); Sweezy v. New Hampshire, 354 U.S. 234, 255, 256-57, 77 S.Ct. 1203, 1214-15, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in the judgment); Highland Farms Dairy v. Agnew, 300 U.S. 608, 612-13, 57 S.Ct. 549, 551-52, 81 L.Ed. 835 (1937); Dreyer v. Illinois, 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902). For the federal courts, the interpretation of the statute by the Supreme Court of Indiana is conclusive as a matter of State law.
Defendants assert that the Supreme Court of Indiana has removed any constitutional defects in the medical emergency exception. In addition to the specific answers to the three certified questions, defendants rely on several comments by the State court: that "all relevant factors pertaining to a woman's health can, indeed must, be considered when deciding whether to dispense with the statute's informed consent provisions," 671 N.E.2d at 108-09; that the statute "permits immediate abortion far short of medical calamities;" that a physician "may dispense with the statutory informed consent requirements when she concludes in her best clinical judgment that her patient's condition indicates an abortion is medically necessary," id. at 110; and that the exception "excuses a woman from the informed consent requirement when there is a significant threat to her life or health, physical or mental," id. at 111. The State court made clear its commitment to upholding the statute. The majority commented that "we might well modify our view of the statute's demands if doing so would preserve its constitutionality." Id. at 110. As the defendants now contend in this court, the State court has essentially construed the statute to mean that a physician may dispense with the waiting period and mandatory disclosure requirements if the physician determines in good faith that it is in the patient's best medical interest to dispense with those requirements. Transcript of July 3, 1997, Hearing at 9-10. As a matter of State law, the medical emergency exception now effectively applies whenever a physician makes a good faith clinical judgment that compliance with the informed consent and waiting period requirements would present "a significant threat to the life or health of the woman." See 671 N.E.2d at 108.
Plaintiffs contend that the medical emergency exception is still unconstitutional and that the court should therefore leave in effect its injunction against enforcement of Public Law 187 in its entirety. To support their position, plaintiffs have focused on the State court's holding that the medical emergency exception does not apply where compliance with the waiting period and informed consent provisions of the statute "threatens to cause severe but temporary physical health problems for the woman." Plaintiffs contend first, that there is a category of "severe but temporary" health problems that can be alleviated by an immediate abortion; second, that requiring a woman in those circumstances to comply with the waiting period causes an undue burden on her right to choose to have an abortion; and third, that if a State law regulating abortion might ever be applied so as to cause any significant harm to a woman's health, enforcement of the entire law must be enjoined. Defendants dispute each of these steps in the argument.
The evidence on the "severe but temporary" issue consists of affidavits and deposition testimony from two physicians submitted in response to the State court's interpretation *967 of the law. Although the two physicians approach legal and policy issues related to abortion from very different perspectives, they agree on most relevant medical matters. Dr. Kirtly Parker Jones submitted an affidavit identifying several conditions that could involve "severe but temporary" problems. These are situations where some form of medical intervention is necessary, and where an immediate abortion is one medically reasonable treatment but not the only medically reasonable treatment. Dr. David J. Kenley submitted an affidavit in response that provides additional information about those conditions, treatment choices, and risks.
The first condition identified by Dr. Jones is hyperemesis gravidarum, which involves nausea and vomiting of sufficient intensity to produce weight loss, dehydration, acidosis from starvation, alkalosis from loss of hydrochloric acid in vomitus, and hypokalemia. Nausea and vomiting are frequent and well-known symptoms in the early stages of pregnancy, but hyperemesis gravidarum is much more severe than "morning sickness" and lasts beyond the first 12 weeks of pregnancy. The condition can become so severe that a woman may require hospitalization and intravenous fluids and nutrition. Both physicians agree that because even the severe condition is manageable by administration of fluids and nutrition, termination of the pregnancy is not necessary, but that it is one treatment option. Where the woman chooses to terminate the pregnancy, Dr. Jones sees no medical reason to delay an abortion, while Dr. Kenley believes it is unlikely that a brief delay of an abortion would cause physiological harm so long as the woman is being treated for the condition. That continued treatment carries modest risks of infection, as well as expense and discomfort. In any event, if the condition is severe, the patient should be stabilized before an abortion is performed, and a patient in a hospital would ordinarily be stabilized before abortion would even be discussed. Jones Dep. at 8.
The second condition identified by Dr. Jones is gestational diabetes. That condition is temporary because, by definition, the condition is resolved by delivery. But severe diabetes can be life-threatening even in the short term, and over the long term can cause blindness, heart failure, and kidney failure. Jones Dep. at 10. Even severe cases of gestational diabetes can be managed so that the pregnancy may continue to full term, most often by changes in diet. Treatment in severe cases may also include insulin injections and other forms of support from physicians and hospitals. Jones Dep. at 11; Kenley Dep. at 26. But termination of the pregnancy is another possible treatment for the condition. Where a woman chooses to have an abortion, Dr. Jones sees no medical reason to delay, while Dr. Kenley sees no medical risk from a brief delay so long as the patient is receiving treatment for the condition. In the most severe cases, where insulin must be administered, good medical practice would require delaying an abortion until the patient is stabilized. There are some risks associated with continued treatment, although those risks appear to be modest and manageable, and continued treatment also requires additional expense. Jones Dep. at 12.
The third condition identified by Dr. Jones is preeclampsia, which is pregnancy-induced hypertension with protein in the urine. The condition can progress to eclampsia, which can involve seizures, liver failure, kidney failure, and cardiac failure. Jones Dep. at 13. Preeclampsia is most dangerous in the second trimester. Jones Dep. at 38. The condition gets progressively worse until delivery or termination of the pregnancy. Id. at 39. Dr. Kenley agrees that in its most severe form, preeclampsia can be life-threatening. Kenley Dep. at 41. Preeclampsia constitutes a medical emergency under virtually anyone's definition, although termination of the pregnancy is not the only treatment option. See Kenley Dep. at 62-63; Jones Aff. ¶ 5. Other available treatments include medication to reduce blood pressure. Dr. Jones asserts that when a woman with preeclampsia elects treatment by abortion, there is no medical reason to delay an abortion, and in fact immediate abortion may well be necessary in severe cases. Jones Dep. at 14-15. The condition can progress quickly, so delay can present significant health risks even in cases that are not severe at the moment: "given that this disease gets worse with time *968 and occasionally quite rapidly, we now have a woman who is not permanently ill, but might be tomorrow." Jones Dep. at 15. Dr. Kenley asserts that a woman with preeclampsia ordinarily would experience no negative medical consequences from delay of an abortion if her condition were treated in the interim. The Supreme Court of the United States concluded in Casey that preeclampsia is covered by the Pennsylvania medical emergency definition. 505 U.S. at 880, 112 S.Ct. at 2821-22. In view of the Indiana court's view that the Indiana legislature intended to adopt the judicial interpretation of the Pennsylvania statutory language, see 671 N.E.2d at 108-10, preeclampsia is a "medical emergency" within the meaning of the Indiana statute.
The fourth condition identified by Dr. Jones is premature rupture of the membranes. The rupture of the membranes surrounding the fetus causes loss of amniotic fluid and creates risks of infection, which can lead in turn to sepsis, kidney failure, and potentially the death of both the woman and the fetus. If rupture occurs before the fetus is viable, abortion is one prudent medical treatment, but it is by no means the only choice. Even when such ruptures occur relatively early in a pregnancy, they can be treated to allow continuing the pregnancy to full term. At the time of Dr. Kenley's deposition, for example, he had a patient whose membranes had ruptured 13 weeks earlier, and she was being treated at home. Kenley Dep. at 51-52. However, if a woman whose membranes have ruptured is already infected by the time she sees a physician, delay in terminating the pregnancy may cause grave illness and death. Jones Dep. at 19; see also Kenley Dep. at 42. Septic shock from premature rupture of the membranes (including botched attempted abortions, especially before abortions became generally legal) was one of the most common reasons for maternal death in this country and continues to be one of the most common reasons for maternal death throughout the world. Jones Dep. at 19. Delay increases the risk of sepsis, as well as the expense of continued hospital treatment. Dr. Kenley agrees with Dr. Jones that if the woman has an "obvious infection," an immediate abortion would be appropriate. Kenley Dep. at 35-36. In the absence of an infection, Dr. Jones sees no medical reason to delay an abortion if the woman chooses one, whereas Dr. Kenley sees little medical risk from a brief delay so long as the condition is being treated.
In her deposition, Dr. Jones also described a condition called herpes gestationis in which a pregnant woman experiences severe skin eruptions and blistering that is "not life threatening" but is "horrifyingly miserable." Jones Dep. at 22. The condition can be so severe in some cases that it leads a woman to decide to terminate the pregnancy, and in those cases, the patient can be sedated before an abortion is performed. Dr. Kenley says the condition can be treated with antihistamines and steroids and that it is not a medical emergency and not a reason to terminate a pregnancy. Kenley Dep. at 52-53. When asked about the consequences of delay for 24 or 48 hours for a woman who chooses to have an abortion, Dr. Kenley testified: "There would be no consequence. The mother would continue to itch and be uncomfortable during that time period, but there would be no long-term adverse physical consequences." Id. at 53. Where a woman chooses to have an abortion, Dr. Jones sees no medical reason to delay an abortion to relieve her from "suffering." Jones Dep. at 22-23, 37.
Based on this evidence, plaintiffs argue these medical conditions present situations in which Public Law 187, as interpreted by the Supreme Court of Indiana, would require a woman to comply with the waiting period and mandatory disclosure consent provisions of the law where delay would create a significant health risk. The court is not persuaded there is a danger that the law would be applied that way in any meaningful number of cases. Although this court predicted earlier that the State courts would adhere to the narrow and restrictive language in the medical emergency exception, the State court's interpretation of the law recognizes a broad range of "significant" health risks and shows an intention to give considerable latitude to a treating physician's clinical judgment. Plaintiffs contend that the possibility that compliance with the law could subject a woman to *969 "severe but temporary" harms renders the statute unconstitutional. That possibility could become a reality only if a woman: (a) wants an immediate abortion; (b) is able as a matter of logistics, apart from the effects of Public Law 187, to obtain an immediate abortion; and (c) suffers from a medical condition that threatens "severe but temporary" medical problems if an abortion is delayed. Based on the evidence presented thus far, that possibility exists at least in theory, but it is more likely that very few women, perhaps no women, would actually satisfy all three of those criteria in a given year.[2]
Plaintiffs argue that where there is no medical reason to delay a woman's choice of an abortion, subjecting a woman to a delay violates her constitutional right to choose an abortion. That position is not consistent with the controlling opinion in Casey. By upholding Pennsylvania's waiting period law against a facial challenge, a majority of the Court in Casey made clear that the timing of an abortion, at least within narrow limits, may be subject to State regulation for reasons other than medical ones.
Based on the medical evidence presented here, plaintiffs also make a more fundamental point about the constitutional requirement  recognized by the Supreme Court from Roe through Casey  that State regulation of abortion must not threaten significant harm to the health of a woman. The evidence from Dr. Jones and Dr. Kenley shows several medical conditions for which an immediate abortion may be one reasonable medical treatment, but where other treatments are also available and can minimize any medical risks from delay. Plaintiffs argue that a woman facing serious medical complications from a pregnancy should not be required to put up with alternative treatments even temporarily merely to indulge the State's useless demand that she have more time to contemplate her choice. Plaintiffs argue that in such a case, the statutory delay effectively forces upon a woman unwelcome medical treatment. That choice, plaintiffs contend, invades a woman's well established right to make her own choices about her own medical treatment. For example, during the delay before an abortion can be performed, sound medical practice may call for continued administration of intravenous fluids and nutrition (for hyperemesis gravidarum), administration of insulin (for gestational diabetes), or administration of antibiotics (for premature rupture of membranes). All of these treatments carry with them their own risks, although they are generally low, and their expenses, which may be very substantial, especially if care is being provided in a hospital.[3]
Plaintiffs argue that if the medical emergency exception in Public Law 187 is interpreted to require a woman to undergo other unwelcome medical treatment in order to protect her health while she waits the mandated time before an abortion, then the medical emergency exception is still unconstitutional. The court agrees that such an interpretation would raise grave constitutional difficulties. The root of the constitutional problem is a person's right to make her own decisions about her own medical treatment. The Supreme Court of the United States has long recognized a constitutional privacy right that severely limits the ability of a State to require a person to undergo medical treatment without that person's informed consent. See Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990), discussing Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (upholding compulsory vaccination during outbreak of smallpox); Washington v. Harper, 494 U.S. 210, 221-22, 229, 110 S.Ct. *970 1028, 1036-37, 1040-41, 108 L.Ed.2d 178 (1990) (prisoners possess significant liberty interest in avoiding unwanted administration of antipsychotic drugs); Vitek v. Jones, 445 U.S. 480, 494, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (transfer to menial hospital and mandatory behavior modification treatment implicates liberty interests); and Parham v. J.R., 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) (children and adults have substantial liberty interest in not being confined unnecessarily for medical treatment).
To this court's knowledge, the Supreme Court has not held or even suggested that a State may require a woman, as a condition of exercising her constitutional right to choose to terminate her pregnancy, to consent to some other form of medical treatment that she would otherwise refuse. Thus, the evidence showing that other medical treatments may often be available to preserve a woman's life and health in the interim before an abortion can be performed under Public Law 187 does not necessarily resolve the constitutionality of the medical emergency exception to the law. In more concrete terms, if a woman is suffering from a severe instance of hyperemesis gravidarum or gestational diabetes, the question is whether the State may require that woman to be treated for a day or two or three in a hospital before she is permitted to have the abortion that she wants immediately and a physician is prepared to perform immediately. The court is not aware of any other situation in which the State would try to dictate such a choice among generally acceptable medical treatments for a serious health condition.
The medical emergency exception to Public Law 187 would therefore raise grave constitutional problems if it were interpreted to prohibit a physician from considering a competent patient's refusal to undergo further alternative medical treatment, or the medical consequences of such refusal, in determining whether an immediate abortion is medically necessary. This court believes that the State court's authoritative interpretation of the law shows that it should not be interpreted to prohibit such considerations when a physician exercises good faith medical judgment. The opinion of the Supreme Court of Indiana in this case shows that a physician may exercise her "best clinical judgment" as to whether the patient's condition "indicates an abortion is medically necessary" and may consider "all significant factors relevant to the woman's health." 671 N.E.2d at 110. Because the State court has interpreted the State law to save its constitutionality and to avoid any significant threat to a woman's health, the law should be construed so that it does not force a woman who wants an immediate abortion and her physician to choose between accepting unwelcome alternative medical treatment and serious risks to her health while the abortion is delayed. Put another way, the relevant analysis of a patient's medical need for an immediate abortion may assume in most cases that the patient will receive other treatment in a hospital (such as intravenous fluids and nutrition, insulin, antibiotics, medication to reduce blood pressure, etc.). But if the patient is unwilling to accept such alternative treatments, the analysis may take into account that absence of other treatment in the interim before an abortion can be performed. As Dr. Kenley testified in his deposition, even where such treatments are medically indicated, physicians and hospitals do not give such treatments over the objection of a patient. Kenley Dep. at 34-35, 67. In view of the State court's expressed intention to save the constitutionality of the statute if a reasonable construction would save it, this court construes the medical emergency exception so as not to require a woman who wants an immediate abortion to subject herself to other medical treatments that she does not want in the interim. The medical emergency exception therefore does not prohibit a physician from evaluating the medical consequences of delay or a patient's refusal to undergo alternative treatments in the interim.
The opinion of the Supreme Court of Indiana has not answered all imaginable questions about the application of the medical emergency exception in Public Law 187, nor can this court do so, even with the additional medical evidence on its possible application. The State court has plainly decided that the medical emergency exception must give wide latitude to a physician's good faith *971 clinical judgment about her patient's best medical interests. The defendants have agreed, seeing no difference between the State court's interpretation and a law that allows the physician to dispense with the waiting period and mandatory disclosure requirements if she determines that it is in the patient's best interests to do so. Transcript of July 3, 1997, Hearing at 9-10. Nevertheless, there may be some situations in which the Indiana statute might still be deemed unconstitutional. For example, in a severe case of herpes gestationis, Dr. Jones and Dr. Kenley agree that delay in an abortion that would cure the condition would not cause long-term adverse health consequences for the woman. Jones Dep. at 21-23; Kenley Dep. at 52-53. Where an adult woman has made an informed and rational choice to end a pregnancy, it is difficult to see what legitimate governmental purpose would be served by requiring her to continue her suffering, in Dr. Jones' language, while she contemplates further the State-mandated information. It is especially difficult to see such a legitimate purpose in the absence of any evidence in this record that providing the information actually has any effectiveness at all in achieving the law's stated purpose. See 904 F.Supp. at 1450-52, 1475.
The record before this court therefore does not show beyond doubt that the medical emergency exception in Public Law 187 will always be constitutional as applied to any individual situation. But the applicable standard here is far more deferential to the State law. The ability of judges or lawyers to imagine a situation in which the medical emergency exception might be unconstitutional as applied does not require that the operation of the entire act be enjoined. As the Supreme Court stated the matter in Casey, if the statute foreclosed the possibility of an immediate abortion despite some significant health risks, the Court "would be required to invalidate the restrictive operation of the provision...." 505 U.S. at 880, 112 S.Ct. at 2821-22 (emphasis added). It is one thing to enjoin the restrictive operation of a law; it is quite another to enjoin the operation of a law of general application merely because it might be applied unconstitutionally in a few cases. On this record, there is now at best a speculative possibility of such unconstitutional application in a very small number of situations. In light of the State court's authoritative interpretation of the medical emergency exception in Public Law 187, plaintiffs have not shown a substantial likelihood of prevailing on their claim that the medical emergency exception will impose an undue burden for a significant fraction of the women who may be subject to its application. Preliminary injunctive relief is no longer warranted on this basis.

II. The Requirement That Mandated Information Be Provided "In The Presence" of the Pregnant Woman.

In the original decision on plaintiffs' motion for a preliminary injunction, this court held that plaintiffs were not likely to succeed on their challenges to the mandatory disclosure and 18-hour waiting period provisions of Public Law 187. There is no evidence that either provision is likely to have any actual effect toward promoting the State's constitutionally legitimate purposes. 904 F.Supp. at 1450-52. As the court explained in that opinion, however, the controlling plurality opinion in Casey focuses on whether the mandatory disclosure and waiting period will actually prevent women from obtaining abortions they choose to have. There is no evidence that either of these provisions will have such an effect.
Public Law 187 also requires that the State-mandated information provided to a woman at least 18 hours before an abortion be provided "in the presence" of the woman. Ind.Code § 16-34-2-1.1. On the strength of the opinion of the Supreme Court of Indiana, defendants have asked the court to vacate the preliminary injunction in its entirety. The defendants argue that the new, broader interpretation of the medical emergency exception completely undoes this court's earlier calculus of prospects for success on the merits and the balance of equitable factors. The court disagrees. The merits of plaintiffs' challenge to the "in the presence" requirement of Public Law 187 do not depend in any way on the merits of their challenge to the medical emergency exception. Plaintiffs have always presented these as independent *972 constitutional flaws in the statute, and the court has treated them as distinct issues.
The "in the presence" requirement has the practical effect of requiring almost any woman seeking an abortion to make at least two visits to an abortion clinic. As defendants have pointed out and this court has recognized, the plurality in Casey upheld a two-trip law against a facial challenge despite evidence and district court findings that the requirement would subject many women to harassment and hostility. See 505 U.S. at 885-86, 112 S.Ct. at 2824-25. Thus, to succeed on their challenge to Indiana's "in the presence" requirement, plaintiffs must come forward with evidence beyond that presented in Casey. Plaintiffs have done so. The court has already explained at length its reasons for concluding that plaintiffs are likely to succeed on the merits of their challenge to the "in the presence" requirement as imposing an undue burden on women's right to choose to have an abortion. See 904 F.Supp. at 1453-62. The court found that plaintiffs have shown a substantial likelihood of showing that the "in the presence" requirement was likely to cause a significant decline  approximately 11 to 14 percent  in the incidence of abortions among Indiana women. Id. at 1457. The pivotal issue in that analysis was whether such a decline in the incidence of abortion was likely to be the result of the burdensome character of the law, or whether it was likely to be the result of a persuasive effect of the waiting period and mandatory disclosures. The court has given both sides the opportunity over the past 23 months to supplement the existing record on this issue, and neither side has submitted any additional evidence. Thus, the balance remains the same.
Based on the existing record in this case, plaintiffs have shown a substantial likelihood that the expected decline in the incidence of abortion would be the result of the burdens imposed by the "in the presence" requirement and not of any persuasive effect of the law. In fact, although waiting period and mandatory disclosure laws have been in effect in several States, there is still no evidence before this court that these laws have any persuasive effects that cause a significant reduction in the incidence of abortion. Although plaintiffs' evidence on this issue does not absolutely foreclose the possibility of a persuasive effect, plaintiffs' evidence has taken into account the additional factors that might explain the decline in abortion in Mississippi. Additional evidence also tends to support this conclusion, including the evidence of the significant changes in patterns of women crossing State boundaries in and out of Mississippi to obtain abortions. See 904 F.Supp. at 1454-55.[4] The additional evidence also includes the evidence concerning *973 the effects of North Dakota's mandatory disclosure and waiting period law, which does not require two trips to the clinic, and the evidence concerning the dynamics of abusive relationships and their effects on abortion decisions. See 904 F.Supp. at 1458-59; accord, Casey, 505 U.S. at 897, 112 S.Ct. at 2830-31 (discussing likely effects of spousal notification requirement on women and children in abusive relationships and holding spousal notification requirement invalid on its face). All the evidence before this court tends to show that it is much more likely than not that the decline in the incidence of abortion under Mississippi's two-trip law has been the result of the burdens the law imposed and not of any persuasive effect the law might theoretically have, and that the experience in Indiana would probably be comparable.
The court did not decide in 1995 and need not decide now whether the current record would persuade the court to issue a permanent injunction against the "in the presence" requirement.[5] After a long but reasonable delay at the request of defendants to seek an authoritative declaration of Indiana law in the State courts, this case remains at the preliminary injunction stage. In deciding a motion for preliminary injunction, the court must try to minimize the risk of error. The evidence before the court shows convincingly that the "in the presence" requirement is likely every year to prevent somewhere between 1,650 and 2,100 Indiana women from obtaining abortions. See 904 F.Supp. at 1462 (law likely to cause 11 to 14 percent decline in incidence of abortion). There is no evidence before the court suggesting that such an effect would be the result of law's persuasive effect. All the evidence on the question tends to show that there is no significant persuasive effect, and that the likely decline in the incidence of abortion would be the result of the law's burdens. Under the undue burden standard as stated and as applied in Casey, the "in the presence" requirement of Public Law 187 therefore appears likely to impose an undue burden on the constitutional right of women to choose whether to have an abortion or to continue the pregnancy. The injunction will remain in effect against the "in the presence" requirement.[6]
*974 The plaintiffs have argued that the court should leave in place the injunction against the entire statute based solely on the probable constitutional defect in the "in the presence" requirement. They contend that the invalid portion of the law is not severable from the otherwise valid portions of the law. The severability of the "in the presence" requirement presents another question of State law. See Leavitt v. Jane L., 518 U.S. 137, ___, 116 S.Ct. 2068, 2069, 135 L.Ed.2d 443 (1996). The question in this case is not difficult. The Indiana legislature has enacted legislation instructing courts to presume in most situations that invalid portions of law should be severed from valid portions. The statute provides:
(a) If any provision of this Code as now or later amended or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions that can be given effect without the invalid provision or application.
(b) Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable. If any provision or application of a statute is held invalid, the invalidity does not affect the remainder of the statute unless:
(1) the remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder would have been enacted without the invalid provision or application; or
(2) the remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application.
This subsection applies to every statute, regardless of whether enacted before or after the passage of this subsection. The general assembly may preserve the legislative history of this subsection by adoption of a concurrent resolution and publication of the resolution in the legislative journals.
Ind.Code § 1-1-1-8. The central question is whether it appears to the court that the legislature would have enacted the remainder of the law if it had known that the invalid portion could not be enforced. See Indiana Dep't of Environmental Management v. Chemical Waste Management, Inc., 643 N.E.2d 331, 342 (Ind.1994).
There is little doubt here that the legislature would have enacted the waiting period and mandatory disclosure provisions of Public Law 187 even without the "in the presence" requirement. Within the logic supporting the law, it is reasonable to suppose that the legislature would have preferred that the mandated information be provided over the telephone rather than not provided at all. The remaining portions of the law generally are internally consistent. Enforcing those provisions without the "in the presence" requirement would not produce logically absurd results. In fact, as initially passed by the Indiana Senate, the bill required only that the information be provided "orally." The "in the presence" language was added on the floor of the Indiana House of Representatives. Plaintiffs point out that the bill's chief House sponsor argued vigorously that the added requirement was important. However, the rationale offered was threadbare  the suggestion that the requirement was needed to prevent impersonation of physicians on the telephone. See 904 F.Supp. at 1464-65. The very weakness of that rationale tends to show that the "in the presence" requirement is not at all essential to the central (or at least the constitutionally permissible) purposes of the entire act.[7] In terms of the severability statute, the remainder of Public Law 187 is not so "essentially and inseparably connected with, and so dependent upon" the "in the presence" requirement *975 as to undermine the presumption of severability. Nor is the remainder of Public Law 187 incomplete and incapable of being executed in accordance with legislative intent without the "in the presence" requirement. The act can be enforced as requiring the waiting period after the mandatory disclosure is provided either in person or by telephone.

III. Implementation

The court will modify its existing preliminary injunction so as to enjoin the defendants only from enforcing the requirement in Ind. Code § 16-34-2-1.1(1) that the mandated information be provided "in the presence" of the pregnant woman. From a practical standpoint, this will cause a significant change in the way that plaintiffs operate their clinics and deal with their patients. The possibility of this change has been on the horizon for more than two years, but plaintiffs and others similarly situated will need a brief period of time to prepare to comply with the mandatory disclosure and waiting period requirements of the law consistent with this modification. Accordingly, the court will enter an order modifying the existing preliminary injunction so as to permit enforcement of Public Law 187, apart from the "in the presence" requirement, as applied to abortions performed beginning November 14, 1997.
NOTES
[1] Under the approach advocated by Justice Stevens in his opinion dissenting in part in Casey, the plaintiffs would appear likely to succeed on their challenges to the mandatory disclosure and waiting period requirements. There is no evidence that the delay and mandatory disclosure will actually serve a "useful and legitimate purpose." 505 U.S. at 920-21 & n. 6, 112 S.Ct. at 2843 & n. 6.
[2] Indiana residents obtain approximately 15,000 induced abortions each year, and only a small portion of those are performed for medical reasons of any kind, let alone emergencies. In addition, in the absence of clear-cut emergencies, patients often experience logistical delays in scheduling abortions. Dr. Kenley points out that many patients who need or want particular forms of treatment, including surgery, are often forced to wait for logistical reasons. Kenley Dep. at 22-24.
[3] Dr. Jones noted that in some of these cases, interim care in a hospital's intensive care unit would be appropriate. No one suggests that the State of Indiana would be willing to pay for the additional expense of medical care required for compliance with Public Law 187.
[4] In his published study, Dr. Henshaw calculated that after the two-trip law took effect in Mississippi, the number of Mississippi residents having abortions in Alabama and Tennessee increased by 17 percent above the expected number, and the number of out-of-state residents having abortions in Mississippi decreased by 30 percent below the expected number. 904 F.Supp. at 1454. These changes tend to support Dr. Henshaw's opinion that the effects of Mississippi's two-trip law are the product of burdens rather than the persuasive force of any mandated information and waiting period. These changes in interstate travel for abortions also raise a question as to whether the observed changes in Mississippi fully reflect the burdens of the law. When State laws differ, as they do with respect to waiting periods and mandatory disclosures, it is now possible for many women to escape burdensome effects of local laws by crossing State borders. But in other areas of constitutional law, the Supreme Court evaluates the effects of a State law based on the assumption that many or all other States could enact similar laws. See, e.g., Healy v. The Beer Institute, 491 U.S. 324, 336-37, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989) (practical effects of State law requiring beer distributors to affirm they were not selling their products at lower prices in bordering States must be evaluated under Commerce Clause by considering "what effect would arise if not one, but many or every, State adopted similar legislation"); and cases requiring "internal consistency" in State taxes, e.g., Armco Inc. v. Hardesty, 467 U.S. 638, 644, 104 S.Ct. 2620, 2623-24, 81 L.Ed.2d 540 (1984) (State tax must be such that, if every State adopted it, there would be no interference with free trade); Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 169, 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545 (1983) (same). Lest there be any misunderstanding, the court is not suggesting there is a Commerce Clause dimension to this case. Instead, the court is suggesting that in gauging the effects of a State law regulating abortions, courts should consider the possibility that many or all States might enact similar legislation. In this case there appears to be no evidence available at this point that would permit measurement or estimate of those possible effects.
[5] In Karlin v. Foust, 975 F.Supp. 1177 (W.D.Wis. 1997), modified in part on other grounds, ___ F.Supp. ___, 1997 WL  (W.D.Wis. Oct. 2, 1997), the court considered similar evidence in a challenge to a Wisconsin waiting period and mandatory disclosure statute imposing what amounts to a two-trip requirement. That evidence included Dr. Henshaw's study of the effects of the Mississippi law with its two-trip requirement, as well as some evidence of the experience in North Dakota's law permitting disclosure by telephone. The court in Karlin was not persuaded that the evidence was sufficient to support a permanent injunction against the Wisconsin law. 975 F.Supp. at 1177, 1217-18. As this court noted in its earlier opinion, this court might come to the same conclusion after a trial on the merits. However, plaintiffs have shown a substantial likelihood of prevailing, and the balance of harms is so one-sided on the record before this court that a preliminary injunction is warranted here to prevent irreparable harm to women in Indiana before a trial on the merits.
[6] When this court issued the preliminary injunction in 1995, the Seventh Circuit had not yet addressed the application of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to the expert opinion testimony of social scientists. See 904 F.Supp. at 1459-62. Over the last two years, the Seventh Circuit has applied the Daubert standards to social scientists in several cases. See People Who Care v. Rockford Bd. of Education, 111 F.3d 528, 537-38 (7th Cir.1997) (statistical study claiming that achievement gap between white and minority students was caused by school officials' racial bias was inadmissible under Daubert because it failed to consider or correct for obvious alternative explanatory variables); Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir.1997) (statistical study claiming that negative correlation between employees' age and retention proved age discrimination was inadmissible under Daubert because it failed to consider or correct for obvious alternative explanatory variables); Tyus v. Urban Search Management, 102 F.3d 256, 263-64 (7th Cir.1996) (district court erred by excluding expert testimony on effectiveness of advertising generally and effects of defendant's advertising on African-Americans); United States v. Hall, 93 F.3d 1337, 1342-45 (7th Cir.1996) (district court erred by excluding testimony from psychologist and psychiatrist concerning false confessions and defendant's propensity to give a false confession). In light of these opinions, the court has reconsidered its Daubert analysis as applied to Dr. Henshaw's testimony. The court continues to believe that analysis is correct, especially for purposes of a preliminary injunction. Unlike the profferred experts in People Who Care and Tyus, Dr. Henshaw carefully considered alternative explanatory variables and explained his analysis of them. See 904 F.Supp. at 1454-55. Although Dr. Henshaw's work does not absolutely and conclusively disprove alternative explanations, it is still persuasive and consistent with the totality of evidence here. A statistical study "is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest." People Who Care, 111 F.3d at 537.
[7] In the original decision on plaintiffs' motion for preliminary injunction, the court did not try to decide whether the "in the presence" requirement might fall under the "purpose" prong of the undue burden test announced in Casey. See 904 F.Supp. at 1465-66. Because this case is still at the preliminary injunction stage, the court still does not decide that issue.